**AMERICAN STEVEDORING INC. and Resources Warehousing & Consolidation Services, Inc., Plaintiffs,**

v.

**UNITED STATES CUSTOMS SERVICE, Anthony Liberta, Regional Commissioner of Customs (Region II), Kathleen M. Haage, Area Director of Customs, Newark, New Jersey, American President Lines, Ltd., East Coast Warehouse & Distribution Corp., Rail Head Transfer, Inc., Container Freight Services, Inc. and H & M International Transportation, Inc., Defendants.**

No. 94–04–00213.
Slip Op. 94–69.

United States Court of International Trade.

May 2, 1994.

**1068**

Gibney, Anthony & Flaherty, Wm. Lee Kinnally, Jr. and Robert L. Follick, New York City, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., Joseph I. Liebman, Attorney-in-Charge, Intern. Trade Field Office, Commercial Litigation Branch, U.S. Dept. of Justice, Civ. Div., James A. Curley, Office of Regional Counsel, U.S. Customs Service, Frank C. Sharp, Washington, DC, of counsel, for defendants U.S. Customs Service, Anthony Liberta and Kathleen M. Haage.

D'Amato & Lynch, Harvey Barrison and Mary Lee Cunningham, New York City, for defendant East Coast Warehouse & Distribution Corp.

Spadoro & Hilson, Arthur T. Hilson, Woodbridge, NJ, for defendant Rail Head Transfer, Inc.

Bathgate, Wegener, Dugan & Wolf, William J. Wolf and Michael M. DeCicco, Lakewood, NJ, for defendant H & M Intern. Transp., Inc.

## MEMORANDUM & ORDER

AQUILINO, Judge:

This action commenced with the simultaneous filing of a summons and complaint and form of order, directing the U.S. Customs Service and its officials Anthony Liberta and Kathleen M. Haage to show cause (1) why they should not be immediately enjoined from permitting the other parties named as defendants to perform as centralized examination stations within the meaning of 19 C.F.R. Part 118 and (2) why Resources Warehousing & Consolidation Services, Inc. should not be reinstated as such a station. The court signed the order to show cause as filed with plaintiffs' application for a preliminary injunction and has held a hearing thereon.

### I

The Customs defendants have filed what they claim to be the underlying administrative record, and they and the plaintiffs offered evidence and oral argument at the hearing in further support of their opposing written submissions.

Section 118.1 of Title 19, C.F.R. defines a centralized examination station ("CES") as

> a privately operated facility, not in the charge of a Customs officer, at which imported merchandise is made available to Customs officers for physical examination. A CES may be established in any port or any portion of a port, or any other area under the jurisdiction of a district director.

According to plaintiffs' complaint, approximately five years ago Customs designated twelve CESes in and around the port of Newark, New Jersey[1], one of which was operated by Resources Warehousing & Consolidation Services, Inc.[2] Then, on January 22, 1993 the Service published a final rule amending the regulatory framework of 19 C.F.R. Part 118 and Parts 151 ("Examination, Sampling, and Testing of Merchandise") and 178 ("Approval of Information Collection Requirements") to "allow Customs to better use its inspectional resources and clear higher volumes of cargo." 58 Fed.Reg. 5,596. This final rule was followed by New York Region Informational Pipeline No. 2266 (April 16, 1993), which advised the importing community that the CES selection process

---

1. Customs defendants' exhibit 7 depicts their cartographic locations.

2. Referred to from time to time hereinafter as "Resources".

was being reopened for the Newark Area and that all existing CESes therein had to reapply for selection by the Service, based upon the following stated considerations:

1. Due to the number of approved examination sites (i.e. Centralized Devanning Stations, CES's) currently in existence and their wide geographic dispersal, Customs has expended an excessive amount of time in traveling between facilities to perform examinations. This has negatively impacted Customs productivity, complicated efforts to match staffing with workload, and consequently, impeded Customs ability to provide a consistent level of service to the importing community. Responsive to the Trade community's service requirements, the Newark Area anticipates reducing the overall number of examination sites, recognizing that those sites which are eventually approved must be geographically convenient to existing CDS's and CFS's.[3]

2. Once the CES approval process is completed, the existing 3 day examination scheduling window will be eliminated. Examinations will normally be scheduled within 24 hours of a shipment's arrival at the CES. CES operators will be required to provide Customs with a daily list of shipments available at their facilities for examination on the following day. Staffing can then be allocated according to workload with a high degree of assurance that freight will be readily accessible.

3. Contraband Enforcement Team (CET) examinations will require expedited movement for examinations. Consequently, due to the sensitive, priority nature of these examinations, CES operators will be responsible for arranging the expeditious movement of CET examination shipments from unlading sites to their CES facilities. Since CET examinations are usually more thorough and time consuming than other inspections, the expeditious movement of these shipments will be critical in facilitating the

release of those found to be non-violative.

4. As a consequence of the anticipated reduction in the number of CES's, those sites which are approved must be able to accommodate a substantially greater volume of examinations, and provide facilities and support for an increased number of Customs personnel....

That Pipeline established a calendar for submission of applications and public comments, listed the "minimum criteria to be considered as a CES", and specified the information an application had to contain. Finally, prospective applicants were advised that their responses to the following numbered specifications "shall constitute the criteria used to judge the application":

2. A description of the site's accessibility to major transportation arteries, rail lines, proximity to major ocean terminals, etc. and location within the port limits, and a floor plan of the facility actually dedicated to the CES operation showing bay doors, office space, exterior features, security features, and staging and work space;

3. A schedule of fees clearly showing what the applicant will charge for each type of service. Subject to any special costs incurred by the applicant such as facility modifications to meet specific cargo handling or storage requirements or to meet Customs security standards, the fees set forth in the schedule shall be comparable to fees charged for similar services in the area to be served by the CES. These charges will remain in effect unless the CES operator provides a 60 day notice to Customs of any proposed fee changes....

4. A detailed list of equipment, which shows that the operator can make a diverse variety of cargo available for examination in an efficient and timely manner for containers, cartons, bales, bags, coils, refrigerated (reefer) cargo, garments on

3. CDS is the acronym for a centralized devanning station, while CFS stands for centralized freight station.

hangers, palletized cargo, bulk cargo, loose freight, etc.

\* \* \* \* \* \*

7. Any information showing the applicant's experience in international cargo operations and knowledge of Customs procedures and regulations, or a commitment to acquire that knowledge;

8. A description of available hardware and communication capabilities[.]

On July 30, 1993, Customs issued New York Region Informational Pipeline No. 2288, advising the importing community of receipt of some 17 CES applications and soliciting written comments on them.

By letter dated February 4, 1994, the Service notified Resources that, although its "application, as presented, was found to satisfy the basic conditions set forth in . . . Pipeline 2266, [it] was not selected to operate a CES." [4] A similar statement is found in a letter of rejection dated February 8, 1994 and sent to American Stevedoring Inc. [5] Those notifications were followed by New York Region Informational Pipeline No. 2315 (Feb. 9, 1994), publishing the names and addresses of the five firms selected to be the new CESes.

As a first cause of action, the complaint pleads, among other things, that Customs "acted arbitrarily and capriciously and disregarded the[ ] . . . criteria set forth in 19 CFR § 118.11 and . . . Pipeline No. 2266" [para. 28]; the "reasons cited . . . in [the] February 4, 1994 letter denying Resources' CES application are unsubstantiated and unfounded" [para. 30]; the denial of the CES application "has caused Resources to suffer irreparable injury in terms of loss of present income and

future business opportunity" [para. 31]; "[n]one of the five selected CES sites were in conformity with the published requirements within the allotted 30 day period" [para. 35]; and "Customs has failed to implement its CES plan to date, in violation of its regulations" [para. 36].

The second count of the complaint, pleaded essentially on behalf of American Stevedoring Inc., adds the following allegations, *inter alia:*

39. In selecting Container Freight as a CES, the Customs defendants have selected a location which did not meet the criteria that an applicant be "an existing operation [and that it have] a facility with the capability of handling large volumes of cargo. . . ." At the time its application was submitted, Container Freight did not have "an existing operation" in the State of New Jersey and had no facility whatsoever anywhere.

\* \* \* \* \* \*

41. Specifically, the Customs defendants disregarded the requirement of the site's accessibility to major transportation arteries, rail lines, proximity to major ocean terminals[.] American Stevedoring is under contract with Maher Terminals and has provided Maher's 24 ocean common carriers with CFS services. Maher Terminals handles more than 50% of the general direct arrival/maritime cargo at the Port of New York/New Jersey.

\* \* \* \* \* \*

46. Customs has selected only one on-dock CES location. . . . Because the Container Freight facility is the only carrier/CES selected, Customs is in effect

---

**4.** Prior to this letter, Resources had been notified by Customs that its existing CES designation would expire, effective March 2, 1994.

The reasons stated in the February 4th letter for rejection of Resources were as follows:
Your facility was not chosen since the costs associated with examinations, as presented in your application, were found to be higher than similarly located facilities that were selected to service the indirect importing community. Also, the office space identified . . . to be dedicated in support of Customs Examination teams was limited.

**5.** That letter went on to inform the company that the Service's

decision was attributable to several factors. Your examination fee structure established a dual rate for carriers within a similarly located geographical direct arrival area. Further, the ASI examination rate for devanning/restuffing and opening/closing multiple cartons was higher than similarly located direct arrival facilities. Also, the warehouse space dedicated for the shipping and examination of cargo was minimal. Finally, the office space dedicated to Customs examination teams was limited.

awarding an unfair advantage to this location over all other carriers and terminals. By virtue of its carrier/CES nature, Container Freight will favor its own customers when clearing containers through Customs inspections and discriminate against the containers of other carriers which do not use Container Freight's facilities.

In seeking injunctive relief, the plaintiffs aver that there is no express statutory administrative review of a denial of a CES application and also that they have no adequate remedy at law. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1) and (4) and § 2631(i).[6] *Cf. Conoco, Inc. v. United States Foreign–Trade Zones Board,* 18 F.3d 1581 (Fed.Cir.1994).

## II

■ The plaintiffs recognize, as they must, that "a preliminary injunction is an extraordinary remedy"[7] and can only be granted upon showing:

(1) A threat of immediate irreparable harm; (2) that the public interest would be better served by issuing than by denying the injunction; (3) a likelihood of success on the merits; and (4) that the balance of hardship on the parties favor[s issuance].

*S.J. Stile Associates, Ltd. v. Snyder,* 68 CCPA 27, 30, C.A.D. 1261, 646 F.2d 522, 525 (1981). That is, failure to bear the burden of persuasion as to any of these four factors is ground for denial of an application. *E.g., Bomont Industries v. United States,* 10 CIT 431, 638 F.Supp. 1334 (1986). *See FMC Corporation v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993).

■ The plaintiffs stand on negative ground herein. Even if they suffer action-able harm, the degree of that harm has not been shown to be that which entitles them to immediate, extraordinary, equitable relief. Whatever their economic injury, this court is unable to conclude that it is "irreparable". *Cf., e.g., Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n,* 758 F.2d 669 (D.C.Cir.1985); *Arbor Foods, Inc. v. United States,* 8 CIT 355, 600 F.Supp. 217 (1984). There is no legal right to be designated a CES; and, once designated, Subpart C to 19 C.F.R. Part 118 provides for termination by Customs. Then again, if time is an element of irreparability[8], the challenged designations are for a finite period of time. Finally, Customs could solicit additional CESes if circumstances were to be deemed to so require.

■ Secondly, it can hardly be argued that the public interest would be better served by issuance now of an injunction, what with the elimination of former CESes and intended reliance on a much smaller group by the Service, each one of which is supposed to be open for business no later than today, May 2, 1994. As the defendants argued at the hearing on April 25, 1994, the plaintiffs bear responsibility for the lapse in response to the negative notifications in early February. Of course, passage of time is not the only consideration, but those chosen as the CESes have each offered the court at least some indication of the steps taken and expenses incurred by them since their selection by Customs. Whatever hard evidence may be developed in this regard during further proceedings in this action, suffice it to state that this court cannot now find that the harm the plaintiffs suffer outweighs that already de-

6. The defendants did not contest jurisdiction at the hearing, save government counsel's denial that this Court of International Trade has authority to hear and decide the environmental claims pleaded in the complaint, *e.g.:*

47. The selection by the Customs defendants of American President, East Coast, Rail Head, Container Freight and H & M as CES's creates an environmentally unsound condition. Almost all incoming rail cargo designated for Customs' examination must be transported by truck greater distances from the railroads to one of the approved CES locations. This will substantially increase the amount of conges-

tion on the highways resulting in slower transportation time and greater pollution to the surrounding community.

Resolution of this reservation now, however, is unnecessary to decision of the application at bar.

7. Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction, p. 8.

8. *See, e.g., Bomont Industries v. United States,* 10 CIT 431, 437, 638 F.Supp. 1334, 1339 (1986); *Daido Corporation v. United States,* 16 CIT 987, 997, 807 F.Supp. 1571, 1579 (1992).

scribed on behalf of the five defendant selectees. That is, the balance of hardship on the parties does not favor grant of plaintiffs' application.

With regard to the likelihood of plaintiffs' success on the merits, the best that the court can conclude at the moment is that their complaint does not appear susceptible to a motion to dismiss within the meaning of CIT Rule 12(b)(5). Ergo, the court has granted expedited discovery. In line therewith, while plaintiffs' application for a preliminary injunction must be, and hereby is, denied, each of the defendants is to join issue and to respond as required by the CIT rules of practice but no later than May 23, 1994, at which time this action will be scheduled for final disposition.

So ordered.